MURPHY, J.
| Appellant, M.R.[1], has appealed the trial court’s June 30, 2015 judgment denying his Motion to Reduce Child Support. For the following reasons we affirm the judgment of the trial court and east all costs of this appeal to appellant.

FACTS AND PROCEDURAL HISTORY

The basic facts of this case are not in dispute, however, the procedural history of this case is long and convoluted. On January 22, 2001, a child identified as P.B. was born. At the time of P.B.’s conception, his mother, B.B. was involved in an extramarital affair with her husband’s brother-in-law, M.R. On June 6, 2007, M.R. filed a Petition to Establish Paternity, This petition was dismissed with prejudice by the granting of BJB.’s exception of prescription, On September 10, 2007, the State of Louisiana, Department of Social Services, through the Jefferson Parish District Attorney’s Office (hereinafter “the State”) filed a Petition to Prove Paternity and Obtain Child Support in the Juvenile Court for Jefferson Parish, pursuant to La. R.S. 46:236.1.2. In this action, the State asserted that genetic test results, which were attached, reflected that M.R. was P.B.’s biological father. Further, the petitioner alleged that the child’s mother was entitled to child support based upon La. R.S, 46:236.1.1 et seq.. and La. C.C. art. 241. Following a hearing on.this matter, the judge determined that it was in the child’s best interest for M.R. to be established as P.B.’s biological father and for child support to be ordered.
M.R. appealed that judgment. However, the appeal was dismissed by this Court finding that the judgment at issue was a partial, non-appealable judgment, citing La. C.C.P. art. 1915(B)(2) and La; C.C.P. art. 2083. State, D.S.S. ex rel. P.B. v. Reed, 08-1309 (La.App. 5 Cir. 5/12/09), 15 So.3d 205, 207.
|gOn January 11, 2010, the trial court ordered M.R. to pay B.B. $365.00. per month for P.B,’s support. The State appealed that award, challenging the trial court’s methodology in calculating the child support obligation of a biological father in a “dual paternity” situation. Rather than address the calculation, this Court found that the juvenile court judge abused her limited discretion in calculating an award because the record was devoid of support for the calculation. Accordingly, this Court vacated the support award, reinstated the temporary support award of $1,591.00 rendered February 19, 2009, and remanded to the juvenile court for a hearing to set child support in compliance with the guidelines, including, but not limited to, La. R.S. 9:315.2(A). State, D.S.S. ex rel. P.B. v. Reed, 10-410 (La.App. 5 Cir. 10/26/10), 52 So.3d 145, 147-49, writ denied, 10-2611 (La.2/18/11), 57 So.3d 333.
On July 19, 2012, after several hearings, the trial' court set the permanent monthly support award owed by M.R. at $991.00. This award was made retroactive to February 19, 2009, the date that the temporary order of support-was set. The State appealed that award, arguing the trial court erred in calculating support based on *821 a stipulation that was rejected by this Court and unsupported by the record. The State also challenged the ruling that the award was not retroactive to the date of judicial demand. This- Court found the trial court erred by failing to follow the mandatory procedure for deviation of - a child support award as set forth in La. R.S. 9:315.1(B). Rather than remand this matter for calculation of support, this Court determined there was adequate information in the "appellate record to set support. On April 24, 2013, this Court amended the trial court judgment to set M.R.’s child support obligation at $1,213.00 per month. In addition, this Court made the award retroactive to the date of judicial demand. State, D.S.S. ex rel. P.B., 12-838 (La.App. 5 Cir. 04/24/13) 114 So.3d 1161, writ denied, 13-1193 (La.9/13/13), 120 So.3d 698.
laOn July 17, 2012, M.R. filed a Motion to Reduce Child Support, alleging that his income had significantly decreased through no fault of his own. On June 17, 2013, the State filed a Motion to Have Independent Forensic Accountant/Economist Appointed to Review and Analyze the Defendant’s Financial and Economic Circumstances. On August 21, 2013, the trial court granted the. State’s motion to appoint such independent expert. On September 3, 2013, after considering the list of forensic accountants submitted by both parties, “Brown Forensic Accounting[2]” was “appointed as forensic accountant” and all parties were ordered to “comply with any request for documents that said accountant may require to complete their investigation.”
After four requests for extensions, the report was completed and submitted to the trial court and the parties on August 8, 2014. .
After numerous continuances, trial was held on M.R.’s Motion to Reduce Support on January 30,2016, February 2, 2016, and March 27, 2016. On June 30, 2015, the trial court rendered judgment denying M.R.’s Motion to Reduce Child Support. This appeal followed.

LAW AND DISCUSSION

Material change in circumstance

In his Motion to Reduce Child Support, M.R. stated that “at the time child support was computed, [he] was earning $8,000.00 per month, that he was now earning $3,235.00 per - month,” that his “employment with Entergy was terminated,” and that he is “no longer able to be employed by Entergy.”
l/The law provides that a modification of child support can only be awarded when the party seeking the modification proves there is a material change in circumstance. La. R.S. 9:311 provides in pertinent part:
A. (1) An award for support shall not be modified unless the party seeking the modification shows a material change in circumstances of one of the parties between the time of the previous award and the time of the rule for modification of the award.
H* ⅜ ⅜
C. For purposes of this Section, in . cases where the Department of Children and Family Services is providing support enforcement services: (1) A material change in circumstance exists s when a strict application of the child support guidelines, Part I-A of this Chapter, would result in at least a twenty-five' percent change in the *822 existing child support award. A material change in circumstance does not exist under this Paragraph if the amount of the award was the result of the court’s deviating from the guidelines pursuant to R.S. 9:315.1 and there has not been - a material change in the circumstances which warranted the deviation.
In this case, the trial court found that M.R. “presented no credible evidence to demonstrate a material change in circumstances and as a result failed to meet his burden of proof to establish a modification.” This Court’s review of the trial court’s finding is governed by a two-part test: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the fact finder, and (2) the appellate court must further determine the record establishes the finding is not clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). The trial court’s factual findings should not be reversed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). If the trial court’s “findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse — ” Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous. Stobart v. State, DOTD, 617 So.2d 880, 883 (La.1993). A trial court’s order of child support is entitled to great weight. Carmouche v. Carmouche, 03-1106 (La.App. 5 Cir. 2/23/04), 869 So.2d 224. “[A]n appellate court will not disturb a child support order unless there is an abuse of discretion or manifest error.” State, D.S.S. ex rel. D.F. v. L.T., 05-1965, (La.7/6/06), 934 So.2d 687, 690.
At the trial of this matter, Susan Brown was accepted by the trial court as an expert in forensic accounting. Ms. Brown testified that she was appointed to determine the income of M.R. as well as the income of B.B. and her husband. Ms. Brown explained that M.R.’s income was difficult to determine due to the fact that he is self-employed. However, B.B. and her husband both receive W-2 forms, thus their income was easier to establish. Ms. Brown noted that in this Court’s April 24, 2013 opinion, B.B.’s gross monthly income for child support purposes was found to be $3,027.00, and her husband’s income was determined to be $2,072.00 per month. Ms. Brown reviewed B.B. and her husband’s tax returns and bank records from 2012 and 2013 and did not find any indication of unreported income. Ms. Brown explained that B.B. had received a settlement in the amount of $174,836.92 from a personal injury lawsuit. The majority of these funds had been used to pay down her home loan, pay medical fees, pay legal fees, pay down other debt, and for living expenses. Approximately $25,000.00 of these funds remained in a bank account and Ms. Brown included the interest on this account in her calculation of gross income for child support purposes.
Due to the complex nature of M.R.’s personal income and his significant assets, his financial records are voluminous and complex. Ms. Brown noted that this Court’s April 24, 2013 judgment found M.R.’s gross monthly income for child support purposes to be $12,480.00 based on M.R.’s 2009 income tax return. In formulating her opinions in this case, Ms. Brown reviewed M.R.’s 2009, 2012 and 2013 income tax returns. The 2009 tax return which was filed by M.R. and his wife showed that M.R. has an ownership interest in at least five (5) business |fientities and an ownership interest in at least eight (8) pieces of real estate. Ms. Brown exam *823 ined over 5,000 documents submitted to her by M.R., which included 2012 and 2013 profit and loss statements from his various businesses, 2012 and 2013 bank statements, including cancelled checks, as , well as 2012 and 2013 credit card statements. There were two occasions in which the IRS found M.R. had underreported income and additional taxes were assessed against him. Ms. Brown met with M.R. on two occasions.
There was a significant change in M.R.’s 2012 and 2013 tax returns compared to his 2009 return. M.R. held an. ownership interest in R & R Land Holdings, LLC, (“R & R”). Prior to 2012, income from R & R was reported on the tax return of M.R. and his wife, D.R. In 2012 and 2013, M.R. and his wife filed separate returns and 100% of the income from R & R, which was $79,500.00 and $117,900.00 respectively, was reported on D.R.’s tax return. In addition, in 2012, M.R. stopped working as a project manager and began working as a handyman. M.R.’s gross income on his 2012 tax return was $25,033.00 and on his 2013 tax return was $21,525.00.
Ms. Brown examined the inflows and outflows of the joint bank accounts of M.R. and D.R. for the years 2012 and 2013. She noted payments to one of M.R.’s major daughters of $68,466.00, as well as a $100,000.00 deposit into a savings account.
As noted by the trial court, M.R. failed to offer expert testimony to contradict Ms. Brown’s opinion that M.R. makes significantly more income than he self-reported. Nor did M.R. offer any proposed child support calculations. The trial court found that M.R. failed to present accurate income information on his income and expense affidavit dated July 16, 2012, citing M.R.’s admission that he did not include rental income of $5,000.00 per month from a house located inJjKenner that is solely owned by him, and that he was purposefully inaccurate concerning his purported expenses. The record indicates that rather than present documents from 2012 and 2013 to refute the conclusions of Ms. Brown, M.R. submitted bills and invoices from 2014 and 2015.
Further, M.R.’s testimony supports the trial court’s conclusion that M.R. presented “no credible evidence to demonstrate a material' change in circumstances.” M.R. testified that he and his wife separated their community property and had filed for divorce, however, at the time of trial he admitted that he lived with his wife, rent-free, and shared a bed with his wife. The couple still maintained joint accounts and M.R. admitted- that he had access to those accounts and to the separate property owned by his wife. With regard to R & R, which manages a 203 unit apartment complex, and has gross receipts of $80,000.00 per month, M-.R. testified that he transferred his interest in R & R to his wife and received nothing in return. When questioned as- to why the records of the Secretary of State still listed him as both the agent and owner of that business, M.R. replied that his daughter “must not have updated the paperwork.” With regard to CNH, LLC, (“CNH”) another entity owned by M.R., M.R. testified that he had recently transferred his ownership interest in this entity to his daughter. M.R. testified that prior to 2012, CNH had a contract with Entergy to work on a certain project. M.R. worked as a project manager on this project. The project was completed and CNH did not receive any further work form Entergy, inferring that CNH no longer had income. However, M.R.’s daughter testified that she is compensated $12,000.00 per year for work she performs for CNH. With regard to the rental income-on the Kenner house, M.R. introduced a lease agreement showing the property was leased for $5,000.00 per *824 month starting May 2013, yet his 2013 tax return did not contain evidence of this rental income;
| sHence, there is abundant evidence in the record to support the trial court’s finding that M.R. presented no credible evidence to prove a change in circumstance warranting a reduction in child support. Accordingly, the trial court did not abuse its discretion in denying M.R,’s Motion to Reduce Support.

Voluntary underemployment

In addition, the trial court made a finding of fact that M.R. is voluntarily underemployed. La. R.S. 9:315(C)(5)(b) provides income for child support purposes includes: “Potential income of a party, if the party is voluntarily unemployed or underemployed. A party shall not be deemed voluntarily unemployed or underemployed if he or she is absolutely unemployable or incapable of being employed, or if the unemployment or underemployment results through no fault or neglect of the party.” Under La. R.S. 9:315.11, if a party is voluntarily unemployed or underemployed; child support shall be calculated based on a determination of his or her income earning potential, unless the party is physically or mentally incapacitated, or is caring for a child of the parties under the age of five years. When determining whether a parent is underemployed for purpose of calculating a child support obligation, the court shall consider that parent’s earning capacity in light of all circumstances. Saacks v. Saacks, 05-365 (La.App. 5 Cir. 09/26/06), 942 So.2d 1130, 1132. Voluntary, underemployment is a fact-driven consideration based on the trial court’s wide discretion in determining the credibility of witnesses; this factual determination will not be disturbed on appeal absent a showing of manifest error. Anderson v. Anderson, 11-864 (La.App. 5 Cir. 05/31/12), 96 So.3d 1278, 1281.
On appeal, M.R. argues that the trial court’s conclusion that M.R. is voluntarily underemployed is unsubstantiated by the testimony and evidence at trial. Our review of the record indicates that the trial court did not abuse its ^discretion in finding M.R. to be underemployed as this finding is amply supported by the record.
M.R. received a bachelor’s degree in mechanical engineering in 1978. He worked for McDermott, Inc. from 1978 until 1982. In 1982 M.R. began working for Entergy. M.R. testified that he left the employ of Entergy in' 1997, to “go build houses in Atlanta,” explaining that he was a member of a partnership that was going to build an entire subdivision. According to M.R.’s resume, he began working as a consultant for Entergy in 1997 and continued to perform consulting work for Entergy until 2012.[3] M.R.’s resume lists his position as a “senior project manager/consultant.”
Ashley Hollis, a manager of strategic planning and special projects for Entergy testified[4] that M.R. worked as a project manager for information' technology services according to the contracts under which M.R. provided services to Entergy. These contracts were billed through CNH, an entity owned by M.R. This particular project was to install software into Enter-gy’s computers and to be sure that it works properly once it is installed. The project began in 2008 and was completed in 2012. Ms. Hollis described the function of a project manager — to make sure that all of the necessary steps in the software *825 project are completed; these steps include gathering information, design and construction of the software, and testing and deployment of the software. M.R. did not personally perform these specific functions; rather, he oversaw a team of people who did. Ms. Hollis testified that Entergy would be willing to engage CNH for other services, explaining that there could be work for CNH with Entergy in the future.
linMs. Brown testified that the job description given by -Ms. Hollis regarding M.R.’s services to Entergy most closely matched that of a Computer and Informational Systems Manager. According to the Louisiana Occupational Employment and Wages for the New Orleans Regional Labor. Market, the annual income for- this position is $94,051.00. Income tax records indicate that M.R. was paid $98,400.00 by Entergy in 2011.
M.R. claims he has been unable to obtain any further contracts from Entergy, however, he testified that he no longer wants to perform that type work. The evidence indicates-that M.R. sent one email to Entergy inquiring as to work. Ms. Brown testified that she asked- M.R. why he did not seek opportunities, that would afford him the financial wherewithal that he had for such a long period of time and M.R. responded that lie , “simply chose not to.”
M.R. contends that the skills he used performing work for Entergy was specific to those particular projects and that these skills would not be useful in any other settings. M.R. testified that he had started several businesses over the years, including CNH and R & R. The evidence presented and testimony at trial indicates that M.R. .is a sophisticated businessman. In fact, he testified that in the contract with Entergy, he was a “business analyst.” In answers to interrogatories, M.R. responded that he did not suffer from any physical or mental disabilities. One of the documents M.R. submitted to Ms. Brown, is entitled “2012 work for M.R.” The list of work consists of changing locks, pressure washing, cleaning gutters,, landscaping, and cutting grass. . M.R. testified that he is a licensed home improvement contractor, yet he submitted no evidence that he performed any significant home improvements.
Thus, the record before us indicates that not only did M.R. put forth meager efforts to regain employment in his prior field as a project manager, he chose not to [npursue opportunities commensurate with his full earning capacity in light of .all of the circumstances. Accordingly, we find no error in the trial court’s determination that M.R. was voluntarily underemployed.
In addition, with regard to voluntary underemployment, M.R. argues that Ms. Brown, exceeded her appointment as a forensic accountant[5] by testifying and giving opinions for which she was not appointed or qualified. During' the trial of this matter, counsel for M.R. asked that Ms. Brown not be “allowed to discuss any type of legal theories or conclusions” elaborating that the “concepts of voluntary unemployment or ah, expense sharing or any of that” are “legal determinations ... not within the scope of her expertise.” The trial judge responded:
I think it’s within the scope of her expertise to give an opinion on that but not to make the final determination. The court makes the final determination. *826 And that, that’s what experts do all the time. They give an opinion but they don’t make the final determinations. The court makes the determination.
The court then accepted Ms. Brown as an expert in the seope of her appointment and as a “forensic auditor.”
The trial judge went on to state that objections would “come in” when Ms. Brown says M.R. is voluntary underemployed. The trial judge stated that Ms. Brown “can tell me whether he was underemployed, the voluntary issue is what really has, the court has to determine” then elaborated:
Whether it’s voluntary or not Ms. Brown won’t know, that’s, that’s the- ultimate factual determination of the court, is whether he is voluntarily under employed, I mean that, from the whole testimony Friday, Mr. R. [sic] has said he doesn’t make as much money as he used to, he left Entergy, so, so' that’s something, but the voluntarily part is where we really so, you I, I think you can tell me whether you think he’s under employed or not but the whole voluntary issue, that’s what the court will decide.
| igThe record before us indicates that Ms. Brown examined voluminous documents, reached certain opinions from those documents, and presented those opinions to the trial court. The testimony and evidence presented at trial support her statements regarding M.R.’s employment. M.R.’s resume shows him to be a sophisticated businessman, who had started several successful business entities; however, he submitted a document entitled “list of jobs performed by M.R. in 2012” in which he performed only small manual labor jobs. M.R. described his job at Entergy as being a “business analyst.” He is a licensed home improvement contractor who submitted no evidence to show that he had performed any significant home improvements. The record before us indicates that the trial court reached findings of fact based on all of the evidence presented. Thus M.R.’s argument claiming that Ms. Brown exceeded the scope of her employment is without merit.

Expense sharing

La. R.S. 9:315(C)(5)(c) provides:
The court may also consider as income the benefits a party derives from expense-sharing or other sources; however, in determining the benefits of • expense-sharing, the court shall not consider the income of another spouse, regardless of the legal regime under which the remarriage exists, except to the extent that such income is used directly to reduce the cost of a party’s actual expenses.
In reasons for judgment, the trial court explained that the rulings as to burden of proof and voluntary underemployment make the issue of expense sharing moot, but if the court were to consider the issue it would "find expense sharing benefited M.R. We agree that based on our findings supra, i.e., the trial court correctly found that M.R. failed to carry his burden of proving a material change of circumstance and that M.R. was voluntary underemployed, the issue of expense sharing is moot. Nevertheless, since M.R. has raised the issue of expense sharing on appeal, it will be addressed.
|1sIn an income and expense sheet submitted to the trial court dated July 16, 2012, M.R. stated his monthly expenses were $3,176.00, or $38,100.00 per year. M.R.’s 2012 tax return shows M.R.’s income to be $21,066.00. Based on these documents, Ms. Brown concluded that M.R. was benefiting from expense sharing. In addition, Ms. Brown performed a detailed analysis of the inflows and outflows of the bank accounts of M.R. and his *827 wife, which led to the conclusion that M.R.’s one-half share of actual annual expenses was $104,376.00.
On appeal, M.R. acknowledges that the trial court has the discretion to include or disallow an expense-sharing benefit, however, he argues the trial court erred in doing so in this case because the amounts imputed to M.R. by Ms. Brown are incorrect. In support of this position, M.R. relies on bills that were introduced during M.R.’s rebuttal testimony. However, these bills were from 2014 and 2015, rather than from the relevant periods of 2012 and 2013, that Ms. Brown used to prepare her report. Ms. Brown’s report was submitted in August 2014 and the trial of this matter commenced in January 2015. Certainly, M.R., had ample time to produce evidence of bills as they existed in 2012 and 2013 to refute Ms. Brown’s calculations. Thus, the evidence relied on by M.R. in this assignment of error does not show that the trial court was manifestly erroneous in finding M.R. benefitted from expense sharing.
Additionally, M.R. argues that the most egregious error in Ms. Brown’s calculations is the assumption that M.R. gets a benefit of $2,248.00 from the rental of the Kenner home based on the fact that M.R. receives $5,000.00 per month from the lease of this home. M.R. contends that the house has two separate mortgages, in addition to insurance and property taxes, which are paid by M.R. and negate the rental income. The evidence refutes these assertions. The monthly income and expense list submitted by M.R. dated July 16, 2012 does not list any amount for | urent or house payments. Ms. Brown testified that the joint checking account statements reflect that the mortgage payment on the Kenner house was paid out of the joint checking account. M.R. testified that the Kenner house was first rented in May 2013, however, Ms. Brown testified that the joint bank statements did not show any rental income, nor was any rental income shown on M.R.’s 2013 tax return. M.R. testified that the mortgage on the Kenner house was $4,300,00 per month and there were no second mortgages. However, on rebuttal, he claimed there are payments on a second mortgage in the monthly amount of $772.95. In addition, M.R. refers to the property taxes and insurance due on this property in 2014, but testified that he had not made those payments.
The record supports the trial court’s finding that M.R. benefitted from expense sharing. Accordingly, we find no abuse of discretion in the trial court’s determination that expense sharing benefits accrued to M.R.

Income of B.B. and her husband

In his Motion to Reduce Child Support, M.R. claimed that his income had significantly decreased because his employment with Entergy was terminated and he is no longer able to be employed by Entergy. In the pretrial memorandum in support of his rule to reduce, M.R. argued that a lump sum settlement received by B.B. should have been included as income to B.B.
B.B. was involved in a serious automobile accident which resulted in B.B. having to undergo two surgeries for injuries sustained in the accident. On November 26, 2013, B.B. received a lump sum of $174,-836.92[6] in settlement funds for her injuries. At the time of Ms. Brown’s report, approximately $25,000.00 of the funds re *828 mained and interest earned on these funds was included in Ms. Brown’s calculation of the income of B.B. and her husband.
|1BOn appeal, M.R. argues that the trial court erred in failing to'consider the settlement funds as income to B.B. M.R. correctly points out that La. R.S. 9:315 does not include settlements of personal injury lawsuits in the listing of “gross income” for the purpose of calculating child support payments. M.R. cites Guidry v. Guidry, 08-1166 (La. App. 3 Cir. 02/04/09), 6 So.3d 845, to support his contention that the settlement received by B.B. should be included as income for the purposes of child support. In Guidry, the defendant Was to receive payments for a personal injury settlement every five years until the settlement was paid in full. The Guidry court held that while these funds, can be included the income calculation, only,those amounts actually received could be included in the calculation. Id. at 846-847. In Guy v. Guy, 600 So.2d 771, 733 (La.App. 5 Cir.1992), this Court held that lump sum pro-céfeds from a life insurance policy were “capital” rather than “income” for the purposes of the calculation of child support. However, thé court noted that the receipt of the lump sum could be considered 'for purposes of a deviation from the support guidelines. Id. at 775. More recently, in Kelly v. Kelly, 99-2478 (La.App. 1 Cir. 12/22/00), 775 So,2d 1237, 1241-1244, the court explained that a lump sum settlement should not be included in income for child support purposes, finding the lump sum payment to be a “fund” rather than a “flow.”
In its April 24, 2013 opinion, this Court used the child support guidelines in La. R.S. 9:315 et seq to calculate the amount of child support owed by M.R. The issue at this point in these proceedings is whether there was a change in circumstances sufficient to justify a reduction in the .amount of support M.R. was ordered to pay. The evidence and testimony indicate that the lump sum settlement funds received by B.B. were used to pay down her home loan and pay off bills that accrued while she was unable to work after the accident, The evidence presented indicates that the lump sum settlement did not create a change in circumstance to |lfjustify a reduction in child support owed by M.R.[7] Accordingly, M.R.’s argument regarding the lump sum settlement funds is without merit,.

Cost of expert

The trial court ordered that the fees of the expert,. Ms. Brown, be apportioned as split by Ms. Brown. On appeal, M.R. argues that he should not be responsible for paying any portion of these fees. In support of this position, M.R. cites the transcript of the hearing appointing an expert in which the trial court stated that an expert would be appointed and M.R. would be charged with the expert fee if it turns out he “in some way cooked the books so to speak.” M.R. contends that Ms. Brown’s report does not state that he was engaged in “cooking the books” or “foul play” and as such he should not have to pay any of the expert fees. M.R. further argues that Ms. Brown was in essence the expert for the State.
In apportioning the expert fees, the trial court stated that under La. C.C.P. art. 1920, the court could order the party cast in judgment to pay the expert fees or could render judgment for costs “against any party, as it may consider equitable.” The trial court went on to find Ms, *829 Brown’s apportionment of costs to be equitable.
Ms. Brown submitted a detailed bill with her report. She explained that she reviewed over 5,000 documents to determine the income and, expenses of M.R. She explained that 75% of her time was spent on the determination of income and expenses of M.R. and 25% was spent on determining the income and expenses of B.B. and her husband. The time spent on court appearances was divided equally between the parties. ...
The. record indicates that M.R. was not truthful or forthcoming about his income and expenses. In denying M.R.’s Motion for New Trial, the court stated |17that although M.R. did not do “anything, criminal” he did find M.R.’s actions to be “fraudulent in a sense.” Thus, the record contains adequate support for the trial court’s assessment of 75% of the expert’s fee to M.R. Accordingly, this assignment of error is without merit.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. Appellant is cast with all costs of this appeal.
AFFIRMED

. To protect the minor child's privacy, the child’s initials, as well as the initials of the parents will be used. See, U.R.C.A. 5-2.

. Susan E. Brown performed the services rendered under the appointment for Brown Forensic Accounting.

. According to the resume, some of this work was done through R & R,, while other work was done through CNH.

. The December 7, 2011 deposition of Ms. Hollis was admitted into evidence.

. Forensic accountants are sometimes appointed in domestic cases to assist the court by examining the parties’, finances.' See, Shaw v. Shaw, 46,993 (La.App. 2 Cir. 02/29/12), 87 So.3d 235, 239; Myers v. Myers, 04-2120 (La.App. 4 Cir. 04/26/06) 931 So.2d 1104, 1106.

. On appeal,' M.R. argues that B.B. actually received $201,300.00 in settlement income, however, the documents admitted into evidence indicate that B.B. received a lump sum of $174,836.92.

. M.R. filed the Motion to Reduce Child Support on July 17, 2012, nearly a year and a "half before B.B. received the lump sum settlement.